# Illinois Official Reports

## Appellate Court

---

### *People v. Salazar*, 2014 IL App (2d) 130047

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRANCISCO SALAZAR, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-13-0047 |
| Filed | November 20, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant was properly found guilty beyond a reasonable doubt of the first-degree murder of one victim and the attempted first-degree murder of two other victims under a theory of accountability, notwithstanding defendant's contention that he did not know the actual shooter had a firearm when the gang-related shooting occurred, where defendant was the driver of the vehicle in which the shooter was a passenger, defendant and the shooter were members of the same gang, he assisted in the commission of the shooting by giving a "go-ahead" signal, "piloting" the vehicle to allow the shooter to fire straight at the vehicle in which rival gang members were riding, and then fleeing the scene; furthermore, defendant's actions showed that he shared a common design with the shooter. |
| Decision Under Review | Appeal from the Circuit Court of Kendall County, No. 09-CF-508; the Hon. John A. Barsanti, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Alan D. Goldberg and Emily S. Wood, both of State Appellate Defender's Office, of Chicago, for appellant. |
|---|---|
| | Eric C. Weis, State's Attorney, of Yorkville (Lawrence M. Bauer and Diane L. Campbell, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion. Presiding Justice Burke and Justice Hutchinson concurred in the judgment and opinion. |

## OPINION

¶ 1    After a jury trial, defendant, Francisco Salazar, was convicted of one count of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2008)) and two counts of attempted first-degree murder (720 ILCS 5/8-4(a), 9-1 (West 2008)). All three convictions were based upon a theory of accountability. Defendant was subsequently sentenced to 30 years' imprisonment on the first-degree murder conviction and 15 and 10 years' imprisonment on the attempted murder convictions. All sentences were ordered to be served consecutively. On appeal, defendant contends: (1) the State failed to prove him guilty of the offenses, because there was no evidence that he knew his codefendant had a gun and, therefore, shared any common criminal intent or design with the shooter, as necessary to make him legally accountable for the shooter's actions; and (2) the jury was improperly instructed on the attempted murder charges, where the names of the victims were not included in the instructions. For the following reasons, we affirm.

¶ 2                              I. BACKGROUND

¶ 3    We initially note that after filing its brief in this case the State filed a motion to cite additional authority, the Fourth District's recent opinion in *People v. Phillips*, 2014 IL App (4th) 120695. Defendant then filed a motion requesting to respond to the case and attaching his response. After reviewing both parties' motions, we grant the State's motion to cite *Phillips* as well as defendant's request to respond. The case as well as defendant's response will be discussed in the analysis portion of this disposition.

¶ 4    At trial, defendant testified that around 10 p.m. on December 19, 2009, he received a telephone call from George Aguilar. Aguilar asked defendant to come to his house. Defendant texted his girlfriend to see if he could meet with her later that evening, and he then drove to Aguilar's house, near Montgomery, Illinois. When defendant got to the house, he saw Zachary Reyes, Eloy Sandoval, and Cesar Corral standing outside with Aguilar. Defendant knew Aguilar well and "hung out" with Sandoval frequently, although he did not have Sandoval's telephone number. He did not know Corral very well. Defendant had never met Reyes before that night. Defendant was not in a gang, but he knew that Aguilar and

Sandoval were both Latin Kings gang members. He did not know if Reyes or Corral was a member of a gang.

¶ 5 Defendant and the four other men got into defendant's Chevy Tahoe. Reyes was the front passenger, Corral sat behind Reyes, Sandoval sat in the middle of the backseat, and Aguilar sat behind defendant. They decided to go to a party in Oswego, but stopped at a 7-Eleven store on the way. Corral went into the store and bought alcohol and cigars. Corral, Aguilar and Sandoval made the cigars into marijuana-filled "blunts." The three people in the backseat smoked the blunts and Corral and Sandoval also drank, while defendant drove.

¶ 6 Defendant testified that he was not familiar with the area and did not know where to go. Sandoval directed defendant to the party, and, when they arrived, Sandoval told Reyes and Corral to go in and see whether the party was worth the cover charge. When Reyes and Corral came back to the vehicle they said that the party might not be worth their time. Defendant began to drive away and Corral told him to wait. Defendant said that he looked at Corral and saw him "doing some hand gestures and flicking somebody off." Defendant then drove off.

¶ 7 Sandoval told defendant that he had missed a turn and that he needed to turn around, so defendant did so. Defendant was trying to get out of the area, but Sandoval suggested going back to the party. Aguilar stated that he just wanted to go home.[1] Defendant told them to make up their minds and did another U-turn. Defendant pulled up to the intersection at Douglas and Long Beach and stopped at the stoplight. Defendant planned to turn left and noticed the taillights of a vehicle turning right. He reached for his cell phone to text his girlfriend that he was on his way home and all of a sudden he heard big bangs and started to duck because he thought he was getting shot at.

¶ 8 The evidence at trial established that Reyes had fired 11 .45-caliber rounds in the direction of a vehicle driven by Jason Ventura. In Ventura's vehicle were Eduardo Gaytan and Jorge Ruiz. After Ventura was shot in the head, he slumped over the steering wheel. The car continued to move and was headed toward a house. Ruiz, who was in the backseat of Ventura's vehicle, grabbed the steering wheel and turned it to the right as much as possible. The vehicle eventually hit a tree and stopped. Ruiz jumped out of the vehicle and began motioning to Deputy Bryan Harl of the Kendall County sheriff's office, who was driving in the area and witnessed the vehicle hit the tree. Harl called for an ambulance and told dispatch that the offending vehicle was a dark-colored Tahoe. Ventura died as a result of multiple gunshot wounds, including one to his forehead. Gaytan was shot in both his arm and his hip. Ruiz was unharmed, although the back window of the vehicle was shattered.

¶ 9 Defendant testified that immediately after the shooting Sandoval said, "[G]o, go, go, what the fuck are you still doing here?" Defendant drove away. He asked Sandoval where to go, and Sandoval directed him to a parking spot in an apartment complex. The subdivision where defendant was driving was known as the "spaghetti bowl" because it was a tangle of streets with very few entrance and exit points. Defendant began to argue with Sandoval because he thought Sandoval knew that Reyes was going to shoot at the other car. Defendant asked Sandoval why he did not warn him. Defendant testified that he said, "[W]hy the hell you doing this, this is stupid shit out of the truck that I am driving?" Sandoval replied, "calm the fuck down" and said that defendant was no one to him. Sandoval told Reyes to get out of the

_____
[1]Aguilar was deceased at the time of trial, and the details surrounding his death were not disclosed.

vehicle and get rid of the gun, and Reyes did so. Sandoval then directed defendant to another apartment complex and told defendant to stop. Sandoval told Reyes to get rid of the hoodie-type sweatshirt he was wearing. Again, Reyes did so. Sandoval took one of his shirts off and gave it to Reyes to wear.

¶ 10    Defendant drove out of the apartment complex and passed a squad car. The squad car followed defendant's vehicle to Aurora, and, at some point, Reyes threw a small bag of marijuana out of the window. Defendant was frightened. Sandoval told him to try to evade the police through one of the side streets. Defendant refused to do so. Officer Shane Burgwald of the Oswego police department pulled defendant's vehicle over and, with his weapon drawn, ordered each passenger out of the vehicle.

¶ 11    Defendant testified that he did not speak with Reyes, Sandoval, or Corral before they met at Aguilar's home that evening. When he arrived at Aguilar's house, there was no discussion about committing any violence, and there was no "gang talk" whatsoever on the way to the party. Defendant never saw a gun prior to the shooting and did not hear anyone talking about a gun or any weapon. In rebuttal, the State introduced a certified copy of defendant's burglary conviction.

¶ 12    Sandoval and Corral were not charged with any crimes and both testified for the State. The men, who were best friends, both testified that no one saw a gun or talked about guns prior to the shooting. Sandoval disagreed, however, with other aspects of defendant's testimony, including his account of Sandoval's actions during the incident.

¶ 13    Sandoval testified and admitted that in 2009 he had been a member of the Latin Kings street gang for four or five years. Corral was a longtime friend of his and Aguilar was a fellow gang member. Defendant was both a friend and a fellow gang member. Reyes was considered a "gang contact" of Sandoval's.

¶ 14    Sandoval said that on December 19, 2009, he was with Corral at Aguilar's home when he saw defendant and Reyes arrive together in a vehicle. Sandoval admitted that he and Corral drank alcohol and smoked blunts with Aguilar. Defendant did not know how to get to the party, so Sandoval directed him. When they arrived at the party, Reyes and Corral went inside the house. They returned about five minutes later and the five men discussed whether they should go inside. At that point they saw two men come outside. Aguilar and Reyes recognized them as belonging to the Ambrose street gang, a rival gang of the Latin Kings. The two men got into a Chevy Impala. Defendant pulled his vehicle up alongside the Impala and Reyes made gang signs that were disrespectful to the Ambrose gang. Sandoval did not see any response from the people in the Impala. He did not want anything to happen that night, because the party was thrown by his sister's friends.

¶ 15    According to Sandoval, no one told defendant to make a U-turn, but he did. As they passed the Impala going the opposite direction, defendant said that he saw someone make a gang sign disrespectful to the Latin Kings. No one in defendant's vehicle responded. Defendant did another U-turn and pulled his vehicle up next to the Impala at an intersection. Defendant then made a hand gesture that Sandoval interpreted as a "go ahead" signal. It was not a gang sign, and Sandoval could not remember if defendant used one hand or two. Sandoval demonstrated the gesture at trial. The State described it on the record as Sandoval taking both of his hands in front of him and moving them to the right side of his body several times.

¶ 16    On cross-examination, Sandoval agreed with defense counsel that the gesture was a cupping of both hands and then a motion like he was carrying or throwing something with his hands. Sandoval admitted that it could have been with just one hand. He also admitted that he had testified at defendant's first trial[2] that the hand gesture was not really a signal at all and that it meant nothing. However, he explained that at the first trial he thought the attorney was asking him if the gesture had gang significance, which it did not. He confirmed that he thought the gesture was a "go ahead" signal.

¶ 17    Sandoval said that Reyes then leaned halfway out of the vehicle's window and that Sandoval heard gunshots. He could tell that Reyes fired shots at the Impala. Sandoval said that it "just happened out of nowhere." After the shots were fired, defendant drove straight off. Sandoval did not direct defendant where to go. After defendant stopped at an apartment complex, everyone was talking and panicking because the shooting had not been planned. Defendant parked his vehicle, and Sandoval suggested that they call someone to pick them up because he was pretty sure that someone would have a description of the Tahoe. They all argued about how they could get back home. They discussed getting rid of the gun, but Aguilar, Reyes, and defendant started the discussion. Reyes then got out of the vehicle to hide the gun. They made another stop in a different apartment complex, and, when Aguilar told Reyes to get rid of his sweatshirt, he did.

¶ 18    Sandoval said that they drove out of the apartment complex and passed a squad car that soon began to follow them. Aguilar and Corral wanted to jump out of the vehicle. Defendant did not stop the Tahoe or say anything. When the vehicle was eventually stopped by the police, everyone was arrested.

¶ 19    Sandoval told the police that he "kind of knew where the gun was" and that he wished to cooperate. By testifying against a fellow gang member, he was no longer a Latin King. Also, cooperating with the police could result in a "violation," or punishment, from other gang members, meaning that he could be beaten, shot, or killed. However, he had not received a violation for testifying at defendant's first trial.

¶ 20    Corral testified that he had met Reyes around three times before the night of the shooting but did not know defendant. Before they went to the party that evening, they all met at Aguilar's house. He could not remember when Reyes came to Aguilar's house. When he and Reyes returned from checking out the party, Aguilar pointed out two men coming outside who got into an Impala next to them. Corral did not remember testifying at defendant's first trial that Aguilar identified the two men as belonging to the Ambrose gang. Corral admitted that he made a sign disrespectful to the Ambrose gang and then "flipped them off." He claimed that he was not a gang member, although he was familiar with the gangs in the area and he knew that Sandoval was a member of the Latin Kings.

¶ 21    Corral said that defendant drove away after he flipped off the men in the Impala. He then rolled another blunt. He was not paying attention to anything–he had his head down and was concentrating on filling a cigar casing with marijuana. However, he admitted that he had previously testified that he heard Aguilar say that someone in the Impala made a sign disrespectful to the Latin Kings.

¶ 22    Defendant pulled up to an intersection. Corral said that he could not recall anyone talking at that time. Corral heard shots ring out, and he ducked. He was high at the time, and he

_____

[2]Defendant's first trial resulted in a deadlocked jury.

could not feel whether the Tahoe was moving. On cross-examination, Corral admitted that he told detectives on the night of the shooting that defendant had turned down the radio and asked which way would get them home.

¶ 23 After the shooting, defendant, Aguilar, and Sandoval appeared shocked. Corral could not see Reyes's expression. Defendant was driving and Corral did not know where they were, but it looked like a type of "condo place." Defendant made two stops. Reyes got out of defendant's vehicle both times, and the second time he returned without wearing his hoodie sweatshirt. As they drove out of the complex, defendant did not say anything. However, Corral acknowledged that he testified at defendant's first trial that he told the detectives that defendant said, "just chill, just chill, we all got lawyers."

¶ 24 Gaytan testified that on the night of the shooting he was at the party with Ventura and Ruiz. They left the party and decided to go to a different party. Ventura was going to drive them to the party. As Gaytan walked toward Ventura's Impala, he saw a driver and a passenger in a black Tahoe.

¶ 25 Gaytan got into the front passenger seat in Ventura's vehicle and they followed his friend Arnulfo Carillo, who was driving a different vehicle. They drove to the intersection and stopped at the light. Carillo was turning right, but they were turning left. Gaytan then heard gunshots and the windows of the Impala shattered. He was hit in his arm and hip. Later, at the hospital, Gaytan spoke to Officer Steve Kaus and viewed a photo array. He identified Reyes as the shooter. He admitted that at defendant's first trial he testified that he could not identify who was in the Tahoe.

¶ 26 Gaytan said that he was not in a gang but had family who were members of the Ambrose gang. On the night of the shooting he never flashed the Ambrose sign and he never saw Ventura or Ruiz make any gang signs. He admitted that he used to "claim" Ambrose and got into trouble at school for drawing gang signs that were disrespectful to the Latin Kings.

¶ 27 Ruiz testified that when he left the party he got into the back of Ventura's Impala. He saw a black sport utility vehicle (SUV) stop right next to them, going in the same direction. He saw a hand rise with a middle finger extended, but he could not see who made the gesture. Ventura was following Carillo's vehicle. Ruiz then saw the SUV back up. Ventura and Carillo both arrived at the stoplight. Ruiz then heard gunshots from behind and he ducked down. The Impala's windows were shattered. He saw the SUV go straight through the intersection.

¶ 28 Ruiz said that Ventura was unconscious and that the Impala was moving through the intersection. Ruiz then grabbed the wheel from the backseat and turned to the right as much as possible. The Impala hit a tree and Ruiz jumped out of the vehicle. Ruiz was physically unharmed. Ruiz denied that he was a member of a gang and that anyone in the Impala was doing anything to represent the Ambrose gang.

¶ 29 Officer Jeffrey Hahn testified and offered expert testimony regarding gang investigation, motivation, and membership. He said that the Aurora police department regularly gathered gang information. He said there were three ways to become an official gang member: (1) to be beaten into the gang; (2) to be "blessed" into membership; or (3) to commit a criminal offense, typically a shooting or a murder, which was the most common method of membership. The police, however, had nine criteria for their own three classifications of gang membership, which were based on the type of "gang contact" that officers have with suspected gang members. Depending on how many of the nine criteria the police observed, a

suspected member could be classified as a member, an associate, or an "other." If there was no gang contact in 12 months, the person was considered inactive.

¶ 30     Hahn said that the Aurora police department considered Ruiz to be an Ambrose associate with four prior gang contacts. Gaytan was considered an "other." Aguilar, Reyes, and Sandoval were all self-admitted members of the Latin Kings. Sandoval had 28 prior gang contacts. Corral and defendant were considered Latin King members by criteria. This meant that each of them had three gang contacts within a 12-month period and that during each contact, two criteria were present.

¶ 31     Hahn testified about defendant's prior gang contacts. In June 2006 he wore his hat turned to the left and was in the company of known Latin King members. In July 2006 he was a passenger in a vehicle that was stopped by the police. Programmed into the digital face plate of the car's stereo was "V-L-K, Vice Lord Killer" and "2K, Deuce Killer." In August 2006 the police stopped him along with two known gang members, one of whom was wearing Latin Kings colors. Defendant, however, was not wearing gang colors at that time. Hahn said that the Latin Kings colors were gold and black. In April 2009, eight months before the shooting, defendant was seen wearing a white, gold, and black shirt and a gold and black Chicago Bulls hat. Although defendant had never admitted that he was in a gang, and Hahn was not aware that he had any gang tattoos, defendant had admitted to an officer in April 2009 that the Aurora police department would most likely consider him to be a Latin King and that he hung out with them very regularly. Finally, Hahn said that he had read defendant's text messages from the night of the shooting and that there was nothing about planning the shooting. Hahn also verified that defendant did text his girlfriend that evening.

¶ 32     The gun, several spent bullets, and 11 shell casings were recovered from the scene. A black hoodie sweatshirt was also recovered, and it tested positive for gunshot residue. DNA testing excluded Sandoval, Aguilar, Corral, and defendant, but not Reyes. Gunshot residue tests on all five men were negative. Two out of three gunshot residue tests on defendant's vehicle came back positive.

¶ 33     During closing arguments, the State acknowledged that the shooting was not planned, but it argued that the shooting presented an opportunity for the occupants of the Tahoe to boost their reputation in the Latin Kings street gang. The State emphasized that by driving the vehicle, and facilitating the escape, defendant aided and abetted Reyes such that the jury could infer that they had a shared intent to kill Ventura, Gaytan, and Ruiz. The State also alleged that defendant's intent could be inferred from his "gang mentality," because, "[w]hen you are a King, you're not just along for the ride."

¶ 34     The jury returned guilty verdicts for the first-degree murder of Ventura and the attempted first-degree murders of Gaytan and Ruiz. Defendant filed a motion for a new trial. At the hearing on the motion, the trial court noted that accountability was the crux of the case and commented:

> "I believe the facts showed it was a reasonable verdict based on the evidence that the defendant piloted that car in position in order to further or promote or facilitate a crime, and I believe that that satisfies the common design rule under Illinois."

¶ 35     The motion for a new trial was denied. Defendant was subsequently sentenced to 30 years' imprisonment for Ventura's murder and 15 and 10 years' imprisonment on the two attempted murder convictions. All sentences were to be served consecutively.

## II. ANALYSIS

Defendant raises two arguments on appeal: (1) the guilty verdicts should be reversed because the evidence was legally insufficient to hold him accountable for Reyes's actions; and (2) the jury received an insufficient instruction on the attempted murder charges because the instruction stated that the *mens rea* of the offense was satisfied if the jury found that defendant intended to kill "an individual" and not specifically Gaytan or Ruiz.

### A. Evidence of Accountability

Defendant first argues that the guilty verdicts should be reversed because the evidence was insufficient to hold him accountable for Reyes's actions. Specifically, defendant argues that the State failed to prove him guilty beyond a reasonable doubt of any of the charges, because he had no prior knowledge that Reyes had a gun or that Reyes had planned any criminal activity on the night of the shooting and, therefore, he could not share with Reyes any common criminal intent or design.

One commits first-degree murder if, in performing the acts that cause the death, he intends to kill or do great bodily harm to a person or knows that such acts will cause such death or great bodily harm. 720 ILCS 5/9-1(a)(1) (West 2008). One commits attempted first degree murder if he, with the intent to kill a specific individual, does any act that constitutes a substantial step toward the killing of that individual. 720 ILCS 5/8-4, 9-1(a)(1) (West 2008).

Under Illinois law, a person is legally accountable for the conduct of another person when either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, or agrees or attempts to aid, such other person in the planning or commission of the offense. 720 ILCS 5/5-2(c) (West 2008). It is well settled that under the Illinois accountability statute the State may prove a defendant's intent to promote or facilitate an offense by showing *either*: (1) that the defendant shared the criminal intent of the principal; or (2) that there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 21. In a common-design case, the rule is that, where a person aids another in the planning or commission of an offense he is legally accountable for the conduct of the person he aids. " '[T]he word "conduct" encompasses any criminal act done in furtherance of the planned and intended act.' " *Id.* (quoting *People v. Kessler*, 57 Ill. 2d 493, 497 (1974)). A conviction based on accountability does not require proof of a preconceived plan if the evidence indicates involvement by the defendant in the spontaneous acts of the group. *People v. Cooper*, 194 Ill. 2d 419, 436 (2000). Also, a common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995).

When presented with a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 32.

Here, defendant argues that the evidence indicated that no one except Reyes himself knew that he had a gun. Without knowledge of the gun, defendant contends, he could not have formed any intent to participate in the shooting, and Illinois courts have refused to hold defendants accountable for their codefendants' gun crimes where the defendants did not

know that the codefendants were armed. As support for this contention, defendant cites *People v. Johnson*, 2013 IL App (1st) 122459. Defendant also notes that the *Johnson* court cited *People v. Phillips*, 2012 IL App (1st) 101923, and *People v. Taylor*, 186 Ill. 2d 439 (1999), two cases in which accountability did not attach to defendants whose codefendants fired guns.

¶ 44    In *Johnson*, the defendant was driving around the neighborhood with another man. They were smoking marijuana, drinking, and intending to pick up women. At some point, the defendant picked up Clayton Sims. They stopped at Brandon Baity's vehicle to see if he had any marijuana to sell. *Johnson*, 2013 IL App (1st) 122459, ¶ 6. Sims got out of the defendant's vehicle and shot Baity several times, killing him. There was no evidence that, prior to the shooting, the defendant knew that Sims had a gun or that Sims intended to shoot Baity. *Id.* ¶¶ 132, 134, 137, 159. However, there was conflicting evidence on whether the defendant blocked Baity's escape route with his vehicle. *Id.* ¶ 144. The jury found the defendant guilty of first-degree murder, based on accountability. *Id.* ¶ 123.

¶ 45    On appeal, the *Johnson* court reversed the defendant's conviction. In doing so, it addressed several aspects of the State's case. The court found that, because there was no evidence that the defendant knew that Sims was armed or that Baity was going to be shot, there could be no evidence of prior intent or advance planning by the defendant. *Id.* ¶¶ 132, 134. The court held that consent to, or mere knowledge of, the commission of an offense is insufficient to constitute aiding or abetting. *Id*. ¶¶ 131, 135. The court also found that, even if the defendant blocked Baity's escape route, there was no evidence that this was done intentionally so that Sims could murder him. *Id*. ¶ 144. Thus, the court found that the evidence, at most, supported a charge of being an accessory after the fact. *Id*. ¶ 149.

¶ 46    Defendant argues that this case is strikingly similar to *Johnson* and that the same result is therefore warranted here. However, in the exercise of its supervisory authority, our supreme court recently ordered the First District to vacate its order in *Johnson* and reconsider the matter in light of the supreme court's recent decision in *People v. Fernandez*, 2014 IL 115527. *People v. Johnson*, No. 117292 (Ill. May 28, 2014) (supervisory order).

¶ 47    In *Fernandez*, our supreme court affirmed the appellate court's judgment upholding the defendant's convictions of burglary and aggravated discharge of a firearm, under a theory of accountability. The supreme court rejected the defendant's argument that, if he did not know that his codefendant was armed, he could not have had the specific intent to promote or aid an offense for which the principal was required to be armed and therefore he could not have been proven guilty beyond a reasonable doubt under a theory of accountability. *Fernandez*, 2014 IL 115527, ¶¶ 12-13. Instead, the court noted that it had long recognized the common-design rule, which holds that where a person aids another in the planning *or commission* of an offense he is legally accountable for the conduct of the person he aids. *Id.* ¶ 21.

¶ 48    The *Fernandez* court specifically overruled *Phillips*, 2012 IL App (1st) 101923, which the *Johnson* court relied upon. The *Fernandez* court also distinguished *Taylor*, 186 Ill. 2d 439, stating that *Taylor* did *not* hold that a person could not be held accountable for a crime that he did not know would occur and therefore could not have intended to facilitate. *Fernandez*, 2014 IL 115527, ¶ 20. Instead, the *Fernandez* court said, in *Taylor* the defendant was the driver of a vehicle whose passenger, wholly unbeknownst to the defendant, intended to commit a crime, and the defendant was convicted of the passenger's crime by

accountability *based principally on the fact that the defendant drove the passenger away from the scene of the crime after its commission*. *Id.* The court noted that *Taylor* was a specific-intent case, not a common-design case, and that the common-design rule, that a defendant will be held legally accountable for another's conduct if he aids that person in the planning or commission of an offense, still applied. *Id.* ¶ 21.

¶ 49 Defendant argues that *Fernandez* is distinguishable from the instant case because in *Fernandez* the defendant helped the codefendant commit a burglary, during which the codefendant fired a gun at a police officer. Defendant claims that, since the defendant in Fernandez had intentionally set out to promote or facilitate the commission of a crime (the burglary), the defendant was accountable for the aggravated discharge of a firearm. In contrast, defendant claims, there is no evidence here that defendant had any knowledge of, or intent to commit, *any* offense.

¶ 50 We are not persuaded. A reading of *Fernandez* makes clear that the supreme court was not holding that a defendant can be accountable for an unanticipated crime only if he intentionally set out to promote or facilitate *another* crime. Instead, the court explicitly held that, "where one aids another in the planning *or commission* of an offense, he is legally accountable for the conduct of the person he aids." (Emphasis added and internal quotation marks omitted.) *Id.*

¶ 51 In its motion to cite additional authority, the State cites *Phillips*, 2014 IL App (4th) 120695, where the court upheld the defendant's conviction under the common-design rule of accountability. In *Phillips*, the defendant intended to give a woman named Frazier a black eye in retaliation for injuries Frazier inflicted on the defendant's ex-girlfriend. *Id.* ¶¶ 1, 9. Grimes came along to identify Frazier and perform "crowd control" while armed with a rifle. *Id.* ¶ 1. When the defendant and Grimes arrived at Frazier's house, they realized that the crowd was too big to approach. The defendant was ready to leave when Grimes fired a single shot and killed a member of the crowd. *Id.* ¶¶ 10-11. The defendant helped Grimes get rid of the rifle by throwing it into a river. He later admitted his involvement and was convicted of first-degree murder and unlawful possession of a weapon by a felon, under a theory of accountability. *Id.* ¶¶ 12, 14.

¶ 52 In affirming the defendant's murder conviction (he did not appeal the other conviction), the court found that the defendant could not escape liability for the murder merely because his original intention was only to give Frazier a black eye. *Id.* ¶¶ 31, 34. It held, "[b]y attaching himself to a group bent on illegal acts, defendant became accountable for all the crimes of his companions, including the shooting of [the victim]." *Id.* ¶ 34. The court also noted that, to be accountable for the shooting, under the common-design theory, the defendant need not have shared Grimes's intent to fire the rifle; instead, "[b]y setting out to commit a crime with Grimes, defendant rendered himself legally accountable for Grimes's shooting." *Id.* ¶ 44.

¶ 53 Defendant argues that *Phillips* is distinguishable because in the instant case no one except Reyes planned any criminal activity on the night of the shooting. We agree with defendant that the facts in *Phillips* are distinguishable because here we have no evidence that defendant attached himself to a group "bent on illegal acts" when he set out on that night. However, we again note that one does not have to intentionally set out to promote or facilitate a crime to be held accountable for another's actions under the common-design rule. Here, it is clear from the evidence that defendant aided Reyes in the *commission* of the shooting, and that alone is

sufficient to hold him accountable for Reyes's actions under the common-design rule. 720 ILCS 5/5-2(c) (West 2008).

¶ 54    The *Phillips* court, however, cited a case that we find instructive. *People v. Tarver*, 381 Ill. 411 (1942), involved two feuding groups of young people, the Tarver group and the Walker group. *Id.* at 412. After a member of the Tarver group, Glenn, got into a fight with a member of the Walker group, Smiley, eight members of the Tarver group agreed to ride together in a truck to confront the Walker group. *Id.* at 413. A member of the Tarver group, Mack, agreed to come along if he was promised that there would be no shooting. *Id.* at 412. However, Mack and another member of the Tarver group brought guns. When the two groups confronted each other, Tarver took Mack's gun and fatally shot Walker. *Id.* at 413. Mack and some other members of the Tarver group were convicted of murder on a theory of accountability. *Id.* at 412. In affirming their convictions, the supreme court said that there was abundant evidence that the Tarver group "banded together" for the purpose of avenging Glenn's beating. *Id.* at 415. It also noted that it was evident that there was ill feeling between the two groups and that the defendants were "members of a gang assembled for the purpose of disturbing the peace and doing unlawful acts." *Id.* at 415-16.

¶ 55    Again, although there was no evidence that, before the shooting, defendant "banded together" with Reyes to engage in unlawful acts (unlike in *Tarver*, where there was evidence that Mack actually brought a gun to the scene despite a claim of seeking to establish "peace"), it is clear that, from the time the men in both vehicles began flashing gang symbols at each other, defendant was aiding Reyes in the commission of the shooting. Specifically, the evidence indicated that defendant, a Latin King, aided Reyes, also a Latin King, in the shooting by giving a "go-ahead" signal and "piloting" his vehicle in such a way that Reyes could shoot straight at the Impala. At oral argument, both the State and the defense acknowledged that defendant's vehicle remained stationary while Reyes fired his gun, a semiautomatic weapon requiring each round to be fired individually, 11 separate times at the Impala. Those shots hit Ventura in the head, hit Gaytan in the arm and hip, and shattered the rear window of the Impala. Given these facts, the jury could infer that, after piloting his vehicle to put Reyes in a good position to shoot at the Impala, defendant waited until the shooting was over before fleeing the scene. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006) (it is the responsibility of the jury, as the trier of fact, to determine the credibility of the witnesses and the weight to be given to their testimony, to resolve any inconsistencies and conflicts in the evidence, and to draw reasonable inferences therefrom).

¶ 56    Defendant claims that the fact that Sandoval was not charged with any involvement in the shooting suggests that he was attempting to repay the State by settling on a story of which it approved. However, the lack of any charges against Sandoval could also be due to the fact that he was cooperative with the police after the shooting, specifically, that he was the one who guided the police to the location where Reyes hid the gun. The jury was aware that Sandoval aided the police after the shooting, and it was for the jury, as the trier of fact, to assess the credibility of all the witnesses. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007) (the trier of fact is best equipped to judge the credibility of the witnesses, and due consideration must be given to the fact that it was the trial court and the jury that saw and heard the witnesses).

¶ 57    We agree with the trial court that the evidence supported the jury's guilty verdicts under a theory of accountability. Again, it was clear from the testimony that defendant piloted his

- 11 -

vehicle in such a manner as to aid in the commission of the shooting and kept the vehicle in a stationary position until the firearm was emptied. Defendant shared a common design with Reyes, as demonstrated by his making multiple U-turns, pulling up next to the Impala at the intersection, and giving the "go ahead" gesture right before Reyes began shooting. Defendant complains that, although the State argued at trial that defendant's alleged gang membership constituted a general common design to commit the unlawful acts, on appeal the State has abandoned this argument and advanced no alternative basis to apply the common-design theory. We disagree. On appeal the State specifically argues that defendant was an active participant and that his actions demonstrated that he shared a common design with Reyes. The State refers to defendant's piloting his vehicle in a manner to aid in the commission of the shooting, as well his making multiple U-turns after the men started using gang symbols, his giving the "go-ahead" gesture, and his pulling up alongside the Impala before Reyes fired the shots. Viewing all this evidence in the light most favorable to the prosecution, we find that defendant was proven guilty beyond a reasonable doubt of the first-degree murder of Ventura, as well as the attempted first-degree murders of Gaytan and Ruiz, under a theory of accountability.

¶ 58                                B. Jury Instruction

¶ 59        Defendant next argues that the jury was improperly instructed on the charges of attempted first-degree murder. Specifically, he contends that the instruction the jury was given erroneously stated that the *mens rea* of the offense was satisfied if the jury found that defendant intended to kill "an individual" and not specifically Gaytan or Ruiz. Defendant concedes that this alleged error was not properly preserved for review because he did not object at trial. However, he argues that we should address this issue as plain error. In the alternative, defendant contends that we should find that his trial attorney provided ineffective assistance when he failed to notice the flaw and seek to correct it.

¶ 60        In response, the State argues: (1) defendant forfeited review of the alleged jury instruction error; (2) the alleged error is not a substantial defect, as necessary to avoid the consequences of forfeiture; (3) no error occurred, so this issue cannot be reviewed as plain error; and (4) since no error occurred, defendant's ineffective-assistance argument should be rejected.

¶ 61        Generally, a defendant forfeits review of any alleged jury instruction error if he does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion. *People v. Herron*, 215 Ill. 2d 167, 175 (2005). Under Illinois Supreme Court Rule 451(c) (eff. July 1, 2006), however, where a jury instruction suffers from a substantial defect, claims of error are not subject to forfeiture on appeal. *People v. Young*, 2013 IL App (2d) 120167, ¶ 20. " 'An erroneous instruction constitutes a substantial defect, or plain error, when the instruction created a serious risk that the defendant was incorrectly convicted because the jury did not understand the applicable law, so as to threaten the fundamental fairness of the defendant's trial.' " *Id.* (quoting *People v. Johnson*, 2013 IL App (2d) 110535, ¶ 76). Plain error arises in this context in two circumstances: (1) when the erroneous instruction was provided in a case where the evidence was closely balanced; or (2) when the flaw in the instruction is so serious that it denied the defendant a substantial right and undermined the integrity of the judicial process. *Id.* (citing *Herron*, 215 Ill. 2d at 178-79). Although jury instructions are generally reviewed for an abuse of

discretion, our standard of review is *de novo* when the question is whether the applicable law was accurately explained to the jury. *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 34.

¶ 62 Here, defendant argues that *People v. Anderson*, 2012 IL App (1st) 103288, is directly on point. In that case, the defendant was charged with the first-degree murder of one individual and the attempted first-degree murder of a second individual. The jury was instructed that it could find the defendant guilty of attempted murder if it found that the defendant intended to kill " 'an individual,' " but the instruction did not specifically name the individual. *Id.* ¶ 56. The defendant was convicted of first-degree murder and attempted first-degree murder. On appeal, the First District reversed the attempted murder conviction and remanded for a new trial on that charge. In doing so, it concluded that the failure of the instruction to specifically name the second individual was confusing and that the verdict might have resulted from the instructional error and not the evidence. *Id.* ¶¶ 64-67. The court noted that, although the instruction was taken from the Illinois Pattern Jury Instructions, Criminal, it was probable that the "ordinary person" in the jury would not understand that the subject of the attempted first-degree murder charge was only the second individual and not the first. *Id.* ¶ 61. Therefore, it held that "the confusing nature of the jury instruction, which failed to specify that the subject of the attempted murder charge was only [the second individual], rendered the instruction erroneous *under the narrow set of facts of this case*." (Emphasis added.) *Id.* ¶ 64.

¶ 63 Defendant claims that the same error occurred here. Based on the plain meaning of the attempted-murder jury instruction, he contends that the jury could have found him guilty of attempted murder based, not on an intent to kill Gaytan or Ruiz, but on an intent to kill *any* individual, in particular, Ventura.

¶ 64 We are not persuaded. Since defendant forfeited this issue by failing to raise it below, we need to first determine whether the jury instruction constituted a substantial error. We find that the instruction was not, because it did not create "a serious risk that the defendant was incorrectly convicted because the jury did not understand the applicable law, so as to threaten the fundamental fairness of the defendant's trial." (Internal quotation marks omitted.) *Young*, 2013 IL App (2d) 120167, ¶ 20.

¶ 65 Indeed, the language denoting "an individual" was appropriate here because there were *two* attempted murder charges involving *two* different victims. In addition, the signed guilty verdict forms, as well as the unsigned not-guilty verdict forms, specifically listed the names of the attempted murder victims–Ruiz and Gaytan. Accordingly, the jury could not have been confused or misled by the attempted-murder instruction. Based upon our determination that the jury was not improperly instructed, we need not review defendant's claim of ineffective assistance of counsel predicated upon this alleged error.

¶ 66                                    III. CONCLUSION

¶ 67 In sum, the evidence presented was sufficient for the jury to find defendant accountable for the first-degree murder of Ventura and the attempted first-degree murders of Gaytan and Ruiz. Also, the jury was not improperly instructed on the attempted murder charges. Accordingly, the judgment of the circuit court of Kendall County is affirmed.

¶ 68 Affirmed.